Filed 6/4/26  P. v. Scott CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B344281 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. VA003230 |
| v. | |
| WALTER STEVE SCOTT, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Joseph R. Porras, Judge.  Affirmed.

Marilee Marshall for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

On five separate days from January to February of 1990, appellant Walter Steve Scott and his codefendant Glenford Brooks engaged in a violent crime spree, culminating in the murders of a pregnant woman and her unborn baby. Scott petitioned to vacate his first degree murder convictions under Penal Code section 1172.6.[1] After an evidentiary hearing, the superior court denied the petition. Scott now appeals the denial of his petition. Because substantial evidence supports the finding that Scott acted with reckless indifference to human life under the currently valid theory of felony murder in section 189, subdivision (e)(3), we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

1.     **Facts**

   a.     *January 27, 1990 incident against Steven J.[2] and M.J.*

On January 27, 1990, at about 10:30 p.m., while Steven J. and his wife M.J. were unloading groceries from their car outside their home in San Gabriel, California, Brooks threatened to kill them at gunpoint. Brooks took some of their valuables, including Steven J.'s wedding ring. Brooks repeatedly ordered Steven J. and M.J. to look down and threatened to shoot they failed to comply.

---

[1]     All further undesignated statutory references are to the Penal Code.

[2]     To prevent disclosure of M.J.'s identity, we refer to her husband as Steven J.

Brooks motioned at a red car driven by Scott who reversed it into the driveway. Scott went into the home through the front door which M.J. had already unlocked. Brooks ordered Steven J. and M.J. to enter their home. Inside, Brooks demanded their money and Scott ransacked the home.

Brooks forced Steven J. and M.J. into the back room and ordered them to sit in a chair facing the corner so they could not see anything behind them. Brooks ordered M.J. to take off her clothes and sit on Steven J.'s lap. Brooks next ordered M.J. to get up and lie down in the doorway of the room. She complied. Scott told Brooks that he did not have to do that or " 'let's not do this.' " Brooks argued with him and said, " 'we are doing it.' " Scott responded, " 'Oh, you always get your way.' " Brooks ordered M.J. to go into the bedroom. She lay down on the bed and Brooks inserted his penis into her vagina. When Brooks stopped, Scott inserted his penis into M.J.'s vagina.

Scott and Brooks repeatedly threatened to shoot M.J. if she did not look down. M.J. was scared because both Scott and Brooks said they were going to shoot her. She asked Scott and Brooks not to hurt them. After Scott stopped engaging in sexual intercourse with M.J., he and Brooks tied her up with phone cord and gagged her with a beach towel.

While M.J. was in the bedroom, Steven J. was bound with phone cord and gagged. He remained seated in the corner of the back room. Steven J. was afraid to turn and periodically felt a gun against the back of his head. Steven J. believed that Scott and Brooks took turns holding the gun to his head. One of them threatened to kill Steven J. if he turned around or tried to get out. He was afraid to move or help M.J. After Steven J. heard the front door open and close and a car drive away, he broke free

3

from his bonds. He found M.J. bound and naked. He untied her and called 911.

Steven J. and M.J. discovered that the home was ransacked. Brooks and Scott took several items. They also discovered graffiti on a wall in the back room in which M.J. and Steven J. were initially ordered to sit. Paint was poured on the furniture.

### b. January 29, 1990 incident against Mary S., Allsup-Bond, and Turnbaugh

On January 29, 1990, at about 8:30 p.m., Mary S. was showing her home in Long Beach, California to prospective tenants Shelly "Dana" Allsup-Bond and Holly Turnbaugh. Brooks opened the front screen door. He entered and pointed a gun at Mary S. Brooks put his fingers to his lips and said, " 'Shhhh.' "

Scott came inside. Brooks removed Allsup-Bond's gold chain from her neck. Brooks and Scott pushed the three women toward the bathroom. Brooks and Scott shouted obscenities at them and told them that they were going to die and that they were going to blow them away and blow off their heads. Brooks and Scott ordered the women to get on the bathroom floor with their faces down. They warned the women that they would blow off their heads and kill them if they turned around. Brooks and Scott demanded their jewelry. Mary S. and Turnbaugh tried to hide some jewelry behind the toilet. Scott and Brooks took $180 from Turnbaugh. Brooks and Scott also demanded their keys. They found Allsup-Bond's and Turnbaugh's car keys in the living room.

After Scott obtained the car keys to two of the cars, he moved items from those cars into the house. Brooks remained

4

inside.  He continued to point his gun at the women, told them they were going to die, and called them obscene names.  Brooks put his gun to Allsup-Bond's head and pulled the trigger.  But the gun did not fire.

When Brooks and Scott only found keys to two of the cars, they searched Mary S.  She had hidden her keys in her belt.  When Scott found the keys, he struck Mary S. on the side of her head and yelled obscenities at her.  Brooks continued to point the gun at Mary S. while Scott took items out of her car.  While Scott was searching Mary S.'s belongings, she heard him urinating.  Mary S. later discovered he had urinated on her belongings that he left behind.

Brooks pointed the gun at Allsup-Bond and Turnbaugh and forced them into a closet in the bathroom.  Scott ordered Mary S. out of the bathroom.  He and Brooks directed her to one of the bedrooms.  Brooks rubbed his hand in Mary S.'s blouse and in her bra.  She told him that nothing was in there.  He responded, " 'Oh, yes, there is.' "  Brooks pushed her into the bedroom at gunpoint.  Brooks tugged at Mary S.'s clothes as he and Scott ordered her to take them off.  Mary S. told them, " 'Look, you guys, don't do this.' "  She also told them that it was not a " 'morally right thing to do.' "  She reminded them that they already robbed them and directed them to " 'just go.' "  Scott struck Mary S. on the head again with all his force and yelled, " 'Take it off.' "  Brooks pointed the gun at Mary S. while she was undressing.  Scott ran to the bathroom to check on the other two women.  When Scott returned, he told Mary S., " 'Come on, hurry up, hurry up,' " then left to check on the other two women.

When Mary S. completed undressing, Brooks pushed her to the floor.  He unbuttoned his pants.  Scott took possession of the

5

gun and continued running back and forth between the bedroom and the bathroom. Brooks made Mary S. lie on the floor and engaged in sexual intercourse with her. Mary S. told Brooks, " 'I can tell you don't want to do this. Why don't you just stop and I will tell your friend you finished.' " She remained quiet when Scott would return. Brooks engaged in sexual intercourse with Mary S. for three to four minutes.

Scott gave the gun to Brooks, then put his penis in Mary S.'s vagina. Scott stated, " 'This is a big mama. She can take me.' " Scott tried to kiss Mary S. but she turned her head and said, " 'Wouldn't you rather kiss someone who would want to kiss you back?' " He stopped having sexual intercourse with her. Scott picked up Mary S.'s skirt and wiped his penis with it.

Brooks and Scott would take turns returning to the bathroom, while the other was in the bedroom with Mary S. Turnbaugh could hear grunting, moaning, and groaning, while she was in the bathroom with Allsup-Bond. She also heard Mary S. begging, " 'Please don't hurt us,' " " 'please don't hurt me,' " and " 'please don't hurt them.' "

After a few minutes, Scott and Brooks placed items near the front door. Scott told Mary S. to face the wall, not to look at him, and pointed the gun at her. Mary S. thought, "[A]fter all he did, they are still gonna kill me." Scott closed the door. Mary S. got up and Scott opened the door. He said, " 'I told you not to turn around. Look at the wall or I am gonna kill you.' " Scott closed the door again. Mary S. remained until she heard the front door close a few seconds later and discovered Brooks and Scott were gone. Turnbaugh and Allsup-Bond forced their way out of the bathroom closet and found Mary S. disheveled.

Turnbaugh estimated that the entire incident lasted close to an hour.

### c. February 24, 1990 incident against Diane G. and Martin G.[3]

On February 24, 1990, at 10:30 p.m., Diane G. arrived home in San Gabriel, California with her three-month-old child. She opened the front door of her home and left her purse and baby bag. She returned to the car to get her child. After detaching the child's car seat, Diane G. saw her husband Martin G. walk out of the front door of the house with Brooks behind him. Martin G. told Diane G. to stay where she was because the man had a gun. Diane G. was stunned and asked what was happening. Martin G. repeated that the man had a gun. Brooks told Diane G. to be quiet and remain where she was. The neighbors pulled into their driveway and Brooks asked Diane G. who they were. Diane G. told Brooks that they were their neighbors. Brooks ordered, " 'Just shut up.' " When the neighbors went into their own house, Brooks ordered Diane G. and Martin G. to " 'hurry up and get inside.' " They complied.

Inside, Diane G. said, " 'Please don't do anything to us. I have got a baby. Please don't do anything to us.' " Brooks responded, " 'Shut up, sit down.' " Brooks made a gesture to " 'come along' " to Scott. After Scott entered, he spoke with Brooks. Diane G. hid her baby on the couch under pillows.

Scott ran through the house, opening and shutting doors. Brooks asked Martin G. if they had any guns in the house. After

---

[3]     To prevent disclosure of Diane G.'s identity, we refer to her husband as Martin G.

Martin G. responded that they did not have any guns, Brooks said, " 'Bitch, if you are lying . . . I am gonna shoot your head off right now.' " Brooks demanded their cash. Diane G. and Martin G. both said they did not have any money. Brooks said, " 'If you guys are lying . . . I am going to blow your heads off . . . you know what? I am gonna kill you anyway . . . I am just going to kill you . . . I can't believe that you guys live in a house like this and don't carry cash, don't have money.' " Brooks would also periodically state, " 'I am gonna kill you right here. You know, I should just kill you right here,' " while pointing the gun at Diane G. and Martin G.

Scott returned with a box of jewelry and gave it to Brooks, who asked if it was the " 'good stuff.' " Diane G. said, "Yeah, it's gold." Brooks said, " 'You better not be lying, bitch. You just better not be lying.' " Brooks repeatedly pointed the gun at her and Martin G., saying, " 'If you guys are lying, I am gonna kill you.' " Brooks demanded Martin G.'s wedding ring. After looking at the ring, Brooks returned it to him. Brooks continued threatening them. He said, " You guys didn't know I lived up the block, did you? . . . I been watching you. . . . Look at my face. Look at it good because this isn't the last time you are gonna see me.' "

Brooks ordered Diane G. to " 'open her blouse.' " Martin G. said, " 'Diane, open—show him your diamond pendant . . . . Take it off and give it to him.' " She complied. Brooks asked, " 'Is it real?' " Diane G. told him that it was real. Brooks ordered, " 'Stand up, bitch. . . . Stand over there and take all your clothes off.' " Diane G. begged, " 'Please, don't do anything to me. I just had a baby.' " Diane G. had recently had a Caesarean section. Brooks replied, " 'Shut up, bitch. Just shut up.' " Scott returned

and took Martin G. to the hallway.  Diane G. continued to plead, " 'Please don't do anything to me.  Please, just leave me alone.  I just had a baby.  Please don't do anything to me.' "

Diane G. tried to run out of the house.  When she opened the front door, Scott ran to it and shut it.  Brooks punched Diane G. in the face multiple times.  She said again, " 'Please, do anything you want, please just don't kill us.  Just don't kill us.' " Diane G. periodically called Martin G.'s name.

Brooks took off his pants and forced Diane G. to orally copulate his penis.  He next made her lie on the floor and put his penis into her vagina.  While Brooks committed the sex acts, Scott pointed the gun at Diane G.

Scott told Diane G., " 'Get over here, bitch. . . .  Put your hands on the couch, bend over."  She complied and Scott sodomized her, while holding the gun behind her head.  Brooks told Scott that he wanted to shoot the ceiling in the dining room. Scott told him, " 'Don't do it.' "  They ordered Diane G. to lie on top of Martin G. who was lying face down in the hallway.  Scott and Brooks continued ransacking the house.  Every time they passed Diane G., they kicked or slapped her.  After ransacking the house, Brooks sodomized Diane G. and Scott forced her to orally copulate him.  Then, they ordered Diane G. to lie down on Martin G. again.

Brooks and Scott continued searching the house.  While at the hall closet, Brooks asked if anything was in it and again asked, " 'Are you sure you don't have any guns?' "  Diane G. looked up at Brooks, who threw three big photo albums at Diane G.'s head, one at a time.

Scott said, " 'Get up, bitch,' " and pulled down his pants for Diane G. to orally copulate him.  Brooks told her, " 'You better

not do it, bitch. You better not do it to him.' " Scott ordered, " 'Do it, bitch.' " And they argued back and forth. Finally, Brooks stated, " 'You do it, I am gonna kill you.' " Scott repeated, " 'You better do it, you bitch, you better do what I am telling you. Do it.' " Diane G. did not know what to do but because she was so scared, she ultimately orally copulated Scott. When she finished, Scott sodomized her again. Scott and Brooks made Diane G. lie down on her husband again. Brooks sprayed her with mustard. Scott and Brooks obtained a Polaroid camera from the house and took photos of Diane G.

Brooks called out to Diane G. and wanted her to orally copulate him again. When Diane G. got up, Brooks told Martin G., " 'Turn around, mother fucker.' " Brooks made her sit on Martin G.'s face. Brooks made Diane G. orally copulate him, while Martin G. orally copulated her. Brooks ejaculated in Diane G.'s mouth. She felt like vomiting. Brooks looked at her and laughed. He said, " 'You mother fucking bitch, you better not choke on it. Swallow it all because if you throw it up . . . I am gonna kill you.' " Brooks pointed his gun at Diane G. Brooks and Scott ordered Diane G. to lie down on Martin G. again. Brooks and Scott moved Diane G. to the television room. They tied Diane G.'s hands with phone cord and wrapped her in a towel, taping it around her with masking tape. Scott wrapped a towel around Martin G.'s head and tied his hands with phone cord. Either Scott or Brooks urinated on Martin G.'s stomach.

Brooks and Scott drove away in Diane G.'s and Martin G.'s Volvo. After Brooks and Scott left, Martin G. checked on the baby who was safe in the living room where Diane G. had left him. Martin G. called 911 from the neighbor's house. The entire incident involving Scott and Brooks lasted about two hours.

10

### d. February 25, 1990 incident against Isaac Bravo, Zoila Bravo, and Chong Min Kim

On February 25, 1990, at 2:00 a.m., Isaac Bravo was with his wife Zoila Bravo and their four-month-old baby in the garage of his apartment in Long Beach, California. Brooks approached them. At gunpoint, Brooks said, " 'Don't move.' " Scott drove up and parked the Volvo that they stole from Diane G. and Martin G. Scott got out of the car and took Bravo's keys and items from his car's trunk.

A neighbor named Chong Min Kim parked his car. At gunpoint, Brooks ordered him to raise his hands. Brooks took his keys and wallet. Scott searched Kim's car.

Brooks and Scott ordered everyone to walk to Bravo's apartment. Brooks threatened to kill them if they refused. When they reached the apartment, Brooks held them at gunpoint as they knelt on the floor. Scott searched the apartment. Brooks repeatedly told Bravo not to look at him.

After taking gold chains, Brooks and Scott ordered everyone to Kim's apartment. When they arrived, they all sat on the floor in the living room while Brooks and Scott searched the apartment. Kim was asked if he had a gun at home and he said that he did not. Brooks and Scott tied up each of them with phone cord and covered them. Brooks and Scott drove away in the Volvo with items taken from Kim's and Bravo's apartments.

### e. February 26, 1990 incident at the Licea house

On February 26, 1990, at 8:00 p.m., Guadalupe Licea was in her house in Huntington Park, California. She was with her

husband Jose Licea, her son Juan Martin Licea,[4] her daughter Sylvia E., Sylvia E.'s husband Alfredo E.,[5] and their son who was nearly two years old.[6] Sylvia was pregnant and expected to deliver in 10 days. Jose went outside to move Sylvia E.'s car. After parking the car, Jose saw Brooks pointing a gun at him. Brooks said, " 'Give me the money or I will kill you.' " Jose told him that he did not have any money. Brooks replied, " 'I told you to give me the money.' " Jose repeated that he did not have any money. Brooks demanded Jose's wallet but Jose did not give it to him.

Guadalupe called out to Jose, but he did not respond. She stood at the kitchen door and saw Brooks with a gun. Brooks told her to go but she said, " 'No.' " Sylvia E. went outside, followed by Guadalupe. Brooks called out and Scott appeared. Brooks pushed Guadalupe and Sylvia E. inside. Brooks and Scott had Guadalupe and Sylvia E. sit down in the living room. Martin was in the living room watching the television when they entered. Brooks ordered Jose to tell Martin to get up and threatened to kill Martin. Scott asked Martin who else was in the house and Martin responded that no one else was there.

Brooks and Scott went upstairs and woke up Alfredo E. Brooks pointed a gun at his head. Scott told Alfredo E. to obey

---

[4] Because the record refers to Juan Martin Licea as Martin, we will do the same.

[5] To prevent disclosure of Sylvia E.'s identity, we will refer to her husband as Alfredo E.

[6] Because Guadalupe Licea, Jose Licea, and Martin Licea share last names, we refer to them by their first names to avoid confusion.

Brooks or he would be shot.  Alfredo E. asked what was happening and told them that they were confusing him.  Scott said, "Don't speak, just get up" and told Brooks, "Fire at him, shoot him if he does not obey."

Brooks and Scott took Alfredo E. downstairs.  Brooks pointed the gun at Alfredo E.'s head and pulled the trigger, but the gun did not discharge.  Brooks laughed at Alfredo E.  Brooks and Scott forced Alfredo E. to sit on the floor with his hands behind his head.  They had Jose lie down on the couch with Martin and Alfredo E. on top of him.

Scott went upstairs while Brooks remained downstairs holding the gun.  Brooks pointed the gun at Sylvia E. and Alfredo E.'s son and threatened to kill him if he was not quiet.  Scott returned and spoke to Brooks who again pointed the gun at the child.  Sylvia E. told Guadalupe, " 'Mother, get him to stay quiet because they are going to kill him.' "  Sylvia E. gave the child to Guadalupe who tried to stop his crying.

Brooks and Scott went upstairs again.  When they returned, Brooks held out a bullet and said, "You think this is not for real, this make believe? . . . Here, it is for real."  Brooks threw the bullet at Alfredo and Martin.  The bullet was returned to Brooks as he commanded.

Brooks asked where the money was located.  Martin said, " 'We don't have no money . . . .  We are poor people.  We all work together. We share the rent.' "  Brooks responded, " 'I don't care, but at the end we are gonna shoot somebody.  We are gonna kill you all.  I don't care what you say.' "  Alfredo E. also said there was no money.  Brooks asked him about guns and he said, " 'There are none.' "  Brooks said, " 'I am going to kill one of you.' "

When Alfredo E. asked, " 'Why?' " Brooks responded, " 'Only because there is no money.' "

Brooks and Scott ordered Jose to sit on top of Alfredo E. and Martin to sit on top of both. Brooks ordered Martin to grab Alfredo's and Jose's buttocks and called him "faggot."

Scott went upstairs again. When he returned, he cut up phone cord with a knife. Scott threw the phone cord at Martin and ordered him to tie up Jose and Alfredo E. Martin initially refused. Scott told Brooks, " 'Kill him, kill him, shoot him, shoot him.' " Brooks kicked Martin and said, " 'Tie them up, or I will kill you' " and asked, " 'You don't believe me?' " Martin told Brooks that he believed him. Jose told Martin to tie them up so Brooks would not shoot him. Martin tied up Alfredo E., Jose, and Guadalupe. Scott obtained the gun from Brooks who went to look around the house.

At some point, Martin was told to take money from Sylvia E.'s bra under her blouse. Sylvia E. said she did not have any money in her blouse. Martin complied, but stated, " 'Whatever you do—do whatever you want, but don't hurt nobody.' " Brooks replied, " 'I don't care what you say. I am gonna kill you.' "

Scott also ordered Martin to hit Alfredo E. When Martin refused, Brooks said, " 'If you don't hit him, I will kill you.' " Martin hit him but with little force. Brooks said, " 'You didn't hit him hard, hit him harder.' " Martin hit Alfredo E. again.

Scott ordered Brooks to watch everyone so they would not move. Scott said, " 'Kill them, fire at them.' " Scott then went upstairs. At one point, Scott threw a book at Jose's head. Scott and Brooks ordered Martin to bring items down from the upstairs bedroom. Brooks directed Martin to obtain money from Jose. Brooks hit Jose. Brooks jumped on the table and pointed the gun

14

at everyone while Scott brought items from the upstairs.  Scott loaded the items into a car.  When Scott returned, he covered Jose's eyes and taped his mouth.

Brooks obtained Martin's bracelet from upstairs.  Brooks ordered Sylvia E. to put it on him while pointing the gun at her head.  Brooks told her not to scream.

Sylvia E. told Guadalupe, "Mom, let's go, oh Mother, let's go, let's go."  Guadalupe said, "If we left, they would kill the child."  Sylvia E. responded, "Mother, they want to do something to me.  Mother, Mother, they want to do something to me.  Mom, they said they are gonna kill all of us."

At some point, Brooks told Sylvia E., "You know what? I want to take you out.  I want to see your breast.  Come here."  Sylvia E. got angry and said, "Yeah, I am gonna show you my breasts."

Sylvia E. got up and began walking and Guadalupe got up behind her.  They pushed Brooks and began fighting with him.  Scott yelled, "Shoot her. Shoot her."  Martin punched Scott in the face.  Brooks shot Sylvia E.  Brooks hit Guadalupe with the butt of the gun on her head, chest, and chin.  Guadalupe grabbed the handle of the gun.  Brooks fired two more shots.  Brooks shot Guadalupe in the right underarm.

Jose removed the blindfold from his eyes and went outside.  He saw Brooks and Scott drive away in a Volvo or Toyota.  Alfredo found Sylvia E. lying next to a China cabinet by the dining table.

Sylvia E. died from multiple gunshot wounds.  She was eight to nine months pregnant.  The fetus died in Sylvia E.'s uterus due to her death.

## 2.    Procedure

### a.    *Trial court proceedings*

On October 4, 1991, the jury convicted Scott of the January 27, 1990 first degree residential robbery of Steven J. and M.J. (§ 211; counts 1–2), and forcible rape in concert of M.J. (§ 264.1; counts 3–4).  As to counts 3 and 4, the jury found true the allegations that Scott personally used a firearm (§§ 1203.06, subd. (a)(1), 12022.3, subd. (a)).

The jury found Scott guilty of the January 29, 1990 second degree robbery of Allsup-Bond, Turnbaugh, and Mary S. (§ 211; counts 5–7), and forcible rape in concert of Mary S. (§ 264.1; counts 8–9).  As to each count, the jury found true the allegations that Scott personally used a firearm (§§ 1203.06, subd. (a)(1), 12022.3, subd. (a), 12022.5, subd. (a)).

The jury convicted Scott of the February 24, 1990 first degree residential robbery of Martin G. and Diane G. (§ 211; counts 10–11).  The jury also convicted Scott of seven counts of forcible oral copulation in concert of Diane G. (§ 288a, subd. (d); counts 12–16), three counts of forcible sodomy in concert of Diane G. (§ 286, subd. (d); counts 19–21), and forcible rape in concert of Diane G. (§ 264.1; count 22).  As to counts 10 through 16, and 19 through 22, the jury found true the allegations that Scott personally used a firearm (§§ 1203.06, subd. (a)(1), 12022.3, subd. (a), 12022.5, subd. (a)).

The jury found Scott guilty of the February 25, 1990 kidnaping for robbery (§ 209, subd. (b); counts 23–25) and first degree residential robbery (§ 211; counts 26–28) of Isaac Bravo, Zoila Bravo, and Chong Min Kim.  The jury found the allegations for personal use of a firearm not true for Scott as to these counts.

16

The jury convicted Scott of first degree murders of Sylvia E. and her unborn child (§ 187, subd. (a); counts 29–30), and first degree residential robberies of Guadalupe, Jose, Martin, Alfredo E., and Sylvia E. (§ 211; counts 31–35). The jury found the felony murder special circumstance (§ 190.2, subd. (a)(17)) true as to the first degree murder of Sylvia E. in count 29. The jury also found allegations for the personal use of a firearm (§ 12022.5, subd. (a)) not true as to counts 31 through 35.

On October 10, 1991, the jury was unable to reach a unanimous decision regarding the sentence to be imposed for Scott. The trial court declared a mistrial on this issue. The District Attorney declined to retry the penalty phase for Scott.

On November 12, 1991, the trial court sentenced Scott to life without the possibility of parole, plus two consecutive terms of life, and one consecutive term of 25 years to life.[7] The court imposed a consecutive aggregate determinate term of 147 years and 8 months.[8]

---

[7] For the first degree murder of Sylvia E. with the felony murder special circumstance (§§ 187, subd. (a), 190.2, subd. (a)(17); count 29), the court imposed life without the possibility of parole. It imposed a consecutive term of 25 years to life for the first degree murder of Sylvia E.'s unborn child (§ 187, subd. (a); count 30). For the kidnaping for robbery of Isaac Bravo and Chong Min Kim (§ 209, subd. (b); counts 23, 25), the court imposed two consecutive terms of life with the possibility of parole. For the kidnaping for robbery of Zoila Bravo (§ 209, subd. (b); count 24), the court imposed a concurrent term of life imprisonment.

[8] The aggregate determinate term was calculated as follows: 21 years for the two counts of forcible rape in concert of M.J. and the firearm enhancement for count 3 (§§ 264.1, 12022.3, subd. (a);

On February 28, 1995, the Court of Appeal affirmed the judgment[9] and remanded to correct sentencing errors.[10]

_____

counts 3, 4); 21 years for the two counts of forcible rape in concert of Mary S. (§ 264.1; counts 8, 9) and the firearm enhancement for count 9 (§ 12022.3, subd. (a)); 84 years for the four counts of forcible oral copulation in concert of Diane G. (former § 288a, subd. (d); counts 12–16), the three counts of forcible sodomy in concert of Diane G. (§ 286, subd. (d); counts 19–21) and the firearm enhancement for count 21 (§ 12022.3, subd. (a)), and one count of forcible rape in concert of Diane G. (§ 264.1; count 22), 11 years for the residential robbery of Martin G. and the firearm enhancement (§§ 211, 12022.5, subd. (a); count 10); and 10 years and 8 months for the residential robberies of Diane G., Jose, Martin, and Alfredo E. and the firearm enhancement for each (§§ 211, 12022.5, subd. (a); counts 11, 32–34). The amended minute order reflects that the sentence was corrected to reflect this calculation.

The trial court further imposed concurrent determinate terms for counts 1, 2, 26, 27, 28, 31, 35.

[9]      *People v. Scott and Brooks* (Feb. 28, 1995, B064465) [nonpub. opn.].

[10]      On remand, the trial court vacated the term for a firearm enhancement as to count 11 and the concurrent terms for counts 27, 28, and 35.

18

### b. *Section 1172.6 proceedings*

On June 16, 2020, Scott filed a petition for resentencing pursuant to section 1172.6.[11]  On March 10, 2021, the superior court found that Scott established a prima facie case for relief and set an evidentiary hearing.

On February 7, 2025, the court conducted an evidentiary hearing.  The court admitted into evidence the reporter's and clerk's transcripts from the direct appeal.

Scott testified on his behalf.  He first testified that he turned 18 years old on January 4, 1990.  He admitted to his involvement in the January 27, 1990 incident with Brooks.  Specifically, Scott admitted that they committed robbery and rape.

Scott further admitted that for each of the incidents, he and Brooks formulated plans to commit the robberies.  When planning the first robbery, he knew Brooks would bring the gun.  Scott claimed they were to use the gun only to get the victims to comply.  They did not discuss shooting or killing anyone.  Scott added that they did not tell the victims they would be shot and only used the gun to scare them to get the items which they demanded.  Scott then admitted he did tell the victims, " 'Give us the money or we're going to shoot you.' "  He further admitted to threatening to kill the victims during the prior incidents if they failed to comply with their orders.

Scott testified that during the second to last incident, Brooks pulled the trigger and the gun did not fire.  Scott claimed

---

[11]    Scott's petition cited to section 1170.95.  Effective June 30, 2022, section 1170.95 was renumbered section 1172.6 with no change in text.  (Stats. 2022, ch. 58, § 10.)

19

that he never knew whether the gun was loaded. Scott said he was shocked when Brooks fired the gun during the last incident. He further claimed that he never intended to kill anyone. But Scott acknowledged that guns could kill. He also testified that Brooks pointed the gun at people on several occasions.

Scott testified in the first incident, he saw Brooks raping M.J. and told him, " 'No, we not here to do this. You know, we're here for a robbery. So let's get that.' " But Scott admitted that he also raped M.J. He further admitted that he raped women in the next three incidents. He and Brooks pointed the gun to each woman's head or body to force them to submit to their sexual assault.

During the last incident, Scott threatened the victims while Brooks pointed the gun at them. Scott cut the phone cord and tied up Jose and Guadalupe with it. He denied that Martin refused to tie up his family members and further denied yelling at Brooks to shoot him. Scott said he saw Brooks fighting Guadalupe and Sylvia E. Scott testified that Martin punched him and Brooks fired shots. Scott got up and ran out the front door and fled in the Volvo taken from one of the prior incidents. Scott did not aid anyone after the shots were fired. He testified that during each of the incidents, this was the only time that the victims fought back. Scott denied yelling at Brooks to shoot them. He also denied ever holding the gun during the incident. He further denied demanding that Sylvia E. show her breasts to him.

At the conclusion of the evidentiary hearing, the superior court denied Scott's petition.

# DISCUSSION

## 1. Changes to the murder law

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437) amended the substantive law on accomplice liability for murder by narrowing the felony murder rule and eliminating the natural and probable consequences doctrine as a theory of liability for murder. (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843, superseded by statute on another ground as stated in *People v. Wilson* (2023) 14 Cal.5th 839, 869.) Pertinent for our review, Senate Bill No. 1437 added section 189, subdivision (e), which provides, " 'A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) [including robbery] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2.' " (*People v. Curiel* (2023) 15 Cal.5th 433, 449 (*Curiel*); *People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*).)

A defendant convicted under the prior felony murder law can petition to vacate the conviction and be resentenced on any remaining count, if they could not now be convicted of murder because of the changes made by Senate Bill No. 1437. (§ 1172.6, subd. (a); *People v. Strong* (2022) 13 Cal.5th 698, 708–709 (*Strong*); *Lewis*, *supra*, 11 Cal.5th at pp. 959–960.) After a petitioner files a petition that contains all required information, the trial court must appoint counsel to represent them, if

21

requested. (§ 1172.6, subd. (b)(3).) The court must also direct the prosecutor to file a response to the petition and permit the petitioner to reply. (*Ibid*.) If the court determines the petitioner has made a prima facie case for relief, it must issue an order to show cause and conduct an evidentiary hearing. (*Id*., subds. (c), (d)(1).)

The prima facie inquiry is limited. (*Lewis*, *supra*, 11 Cal.5th at p. 971.) The court takes the petitioner's factual allegations as true and refrains from factfinding. (*Id*. at p. 972.) "The record of conviction will necessarily inform the trial court's prima facie inquiry under section [1172.6], allowing the court to distinguish petitions with potential merit from those that are clearly meritless." (*Ibid*.)

Dismissal at the prima facie showing stage requires that the record of conviction conclusively establish the jury made findings on all elements necessary to convict under the current law. (*Strong*, *supra*, 13 Cal.5th at p. 708; *Curiel*, *supra*, 15 Cal.5th at p. 450.) If the defendant has made a prima facie showing, the court must issue an order to show cause and conduct an evidentiary hearing on his entitlement to relief. (§ 1172.6, subd. (c); *Strong*, at p. 708; *Curiel*, at p. 450.)

Whether the record of conviction shows the petition is ineligible for section 1172.6 relief as a matter of law is a legal question that we review de novo. (*People v. Lopez* (2022) 78 Cal.App.5th 1, 14.) We review the denial of Scott's section 1172.6 petition after an evidentiary hearing for substantial evidence. (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) Under this standard, "we review the record ' " 'in the light most favorable to the judgment . . . to determine whether it discloses . . . evidence which is reasonable, credible, and of solid value—such that a

22

reasonable trier of fact' " ' " could find beyond a reasonable doubt that Scott acted with reckless indifference to human life. (*Ibid*.)

## 2. Reckless indifference to human life

Substantial evidence supported that Scott acted with reckless indifference to human life during the robberies that led to the killing of Sylvia E. and her unborn baby as required by section 189, subdivision (e)(3).[12]

In *People v. Banks* and *People v. Clark*, the Supreme Court evaluated the requirements for accomplice liability for the felony murder special circumstance. The Court clarified the terms "major participant" and "reckless indifference to human life" as used in the felony murder special circumstance statute. (*People v. Banks* (2015) 61 Cal.4th 788, 803 (*Banks*); *People v. Clark* (2016) 63 Cal.4th 522, 618–623 (*Clark*).) As an accomplice, major participation in the underlying felony requires the defendant's personal involvement to be substantial.[13] (*Banks*, at p. 802.) We

---

[12] We need not address Scott's argument that the theory of liability of felony murder in section 189, subdivision (e)(2) requires that the non-killer must have assisted the killer in the killing itself, rather than merely assist in the underlying felony. The California Supreme Court recently decided this issue in *People v. Morris* (May 4, 2026, S284751) __ Cal.5th __ [2026 WL 1206120].

[13] *Banks* proposed multiple factors to determine whether a defendant's participation in the criminal activities was "sufficiently significant to be considered 'major.' " (*Banks*, *supra*, 61 Cal.4th at p. 803.) These include (1) the defendant's role in planning the criminal enterprise that led to death, (2) her role in supplying or using lethal weapons, (3) her awareness of particular dangers posed by the nature of the crime, the weapons used, or the past experience or conduct of the other participants,

turn to the Supreme Court's analysis of reckless indifference to human life because Scott does not challenge the superior court's finding that he was a major participant in the crimes.

The reckless indifference to human life element "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his [or her] action." (*Clark, supra*, 63 Cal.4th at p. 617.) Reckless indifference has a subjective element which requires an awareness of, and willing involvement in, the violent way the crime is committed. (*Banks, supra*, 61 Cal.4th at p. 801.) The defendant must demonstrate "reckless indifference to the significant risk of death his . . . actions create." (*Ibid*.) Reckless indifference also has an objective element. The defendant's disregard of the risk of death must be "a gross deviation from the standard of conduct that a law-abiding person would observe" in his or her situation. (*Clark*, at p. 617.) Only knowingly creating a grave risk of death satisfies the requirement. Anticipating the use of lethal force does not. (*Banks*, at p. 808.)

The factors considered in *Clark* include "use of or awareness of the presence of a weapon or weapons, physical presence at the scene and opportunity to restrain confederates or aid victims, the duration of the crime, knowledge of any threat the confederates might represent, and efforts taken to minimize risks." (*Strong, supra*, 13 Cal.5th at p. 706; *Clark, supra*, 63 Cal.4th at pp. 618–623.) We evaluate the totality of

---

(4) her presence at the scene of the killing, her ability to facilitate or prevent the murder, and her contribution to playing a role in the death, and (5) her behavior after the lethal force was used. No single factor is required. (*Ibid*.)

24

circumstances with no single factor as necessary or necessarily sufficient. (*Clark*, at p. 618.)

### a. *Knowledge of weapons, and use and number of weapons*

Scott knew that during the February 26 incident Brooks had a gun, which he later used to kill Sylvia E. and her unborn child. At one point, Scott personally held the gun after Martin tied up Jose and Alfredo.

Scott acknowledges that he and Brooks used a gun "for intimidation and to obtain compliance." Scott claims that he did not know the gun was loaded and had "no reason to think" Brooks would shoot. He also attempts to minimize his culpability, as he did in his testimony at the evidentiary hearing, by describing the use of the gun as intended to merely scare the victims with their sole objective of committing the robbery, not killing anyone.

We reject Scott's claims of ignorance. He would have known the gun was loaded when Brooks showed a bullet to the victims and told them it was real. Scott also demonstrated that the use of the gun was not limited to scaring the victims to effectuate the robbery. On multiple occasions, he threatened to shoot the victims to force them to comply with their demands which were not exclusively connected to the robbery. For example, Scott threatened to shoot Martin if he did not hit Alfredo and tie up all the other victims. Similarly, when Sylvia E. and Guadalupe began to push Brooks, Scott ordered him to shoot them. Scott's order to shoot came after he and Brooks had already secured items stolen from the house.

### b. *Physical presence at the crime and opportunity to restrain the crime or aid the victims*

Scott was present at the Licea home and not only watched the events unfold but personally committed violent acts with Brooks. "A defendant's presence may be particularly significant where 'the murder is a culmination or a foreseeable result of several intermediate steps . . . .' [(*Clark*, *supra*, 63 Cal.4th at p. 619.)]" (*People v. Henley* (2022) 85 Cal.App.5th 1003, 1016.) Scott demonstrated this by first declaring to Martin, "I don't care, but at the end we are gonna shoot somebody, we are going to kill you all. I don't care what you say." Scott followed through on this death threat when he ordered Brooks to shoot Sylvia E.

Scott also could have restrained the crime at multiple points during the night prior to the killing. On multiple occasions, he could have told Brooks not to point his gun at the victims. He could have refrained from telling Brooks to kill the victims, including the two-year-old child or telling the victims that he and Brooks were going to kill them at the conclusion before they left. He could have used other means to stop Sylvia E. and Guadalupe from pushing Brooks instead of ordering, "Shoot them. Shoot them." Scott could have tried to ensure Brooks did not shoot by convincing him to leave, distracting him, or calming him down, especially since they had already secured the stolen property. (*In re Loza* (2017) 10 Cal.App.5th 38, 54.) Scott never made any effort to restrain Brooks before he fired the first shot at Sylvia E. (*Clark*, *supra*, 63 Cal.4th at p. 619.) Scott also did nothing to stop Brooks from firing the two subsequent shots at her. Scott knowingly created a serious risk of death by his failure to stop Brooks and his affirmative acts that instigated Brooks to shoot.

26

Scott also did not aid Sylvia E. after Brooks shot her. (*People v. Bradley* (2021) 65 Cal.App.5th 1022, 1034; *In re Parrish* (2020) 58 Cal.App.5th 539, 544.)  Although Scott concedes this, he asserts that family members were present to aid her, rendering his assistance unnecessary.  But could Scott really count on the family members to aid Sylvia E.?  They were bound with phone cord.  Jose's eyes were also covered.  Alfredo was face down.  Scott also ignores the likelihood they would have been paralyzed with fear to do anything counter to his and Brooks's demands.  And if they did, they reasonably would have tried to reach a place of safety.  Above all, Scott was not concerned with Sylvia E.'s well-being, and he did not display any remorse for her victimization.  Instead, he turned his attention to kill another victim.  Scott ordered Brooks to kill Martin who had hit him. While Scott was dealing with Martin, Brooks shot Sylvia E. two more times.  Scott's focus on killing Martin after Sylvia E. was shot further supports his reckless indifference to life rather than negates it.

### c.     Duration of the interaction between the perpetrators and the victims

Scott and Brooks had been at the Licea home for over an hour when the home invasion began developing into a sexual assault of Sylvia E.  With this realization, she and Guadalupe began their flight by pushing Brooks.  Their resistance prompted Scott to order Brooks to shoot.  As demonstrated in this case, an increased opportunity for killing occurs when the victims are restrained at gunpoint by the perpetrators for prolonged periods. (*Clark, supra*, 63 Cal.4th at p. 620; *People v. Emanuel* (2025) 17 Cal.5th 867, 886 (*Emanuel*) [risk of violence was not heightened

27

beyond that inherent in a robbery when entire contact not more than 12 minutes and duration of violent contact was less].)

### d. Knowledge of perpetrator's propensity for violence or likelihood of using lethal force

Scott would have known of Brooks's propensity for violence and his likelihood of using lethal force based on the repeated acts of callousness he committed during the four prior incidents. Brooks initiated contact with the victims in each incident, threatening to kill them at gunpoint. With Scott's help, Brooks isolated the victims in their homes. In three of the incidents, once inside the home, Brooks committed forcible rape, taking turns with Scott on two of the occasions. On those two occasions, Brooks and Scott also brutally beat their victims. In one of them, Brooks also forced the victim to orally copulate him and threatened to kill her if she did not swallow his semen. He also threatened to kill her if she orally copulated Scott. The only inference to be drawn from Brooks's, as well as Scott's, cruelty is that the victims' lives were worth nothing to him.

We reject Scott's argument that based on previous experience, he had no reason to think Brooks would shoot someone, observing that the victims did not resist during the prior incidents. Scott is wrong. During two of the incidents, the women resisted his sexual assault. During the January 29 home invasion, Mary S. failed to relinquish her car keys to Scott and verbally protested his order to take off her clothes. Scott struck her on the head each time. During the February 24 incident, Diane G. tried to escape when Scott ordered her to take off her clothes. Scott chased her and forced the front door shut. He repeatedly punched Diane G. in the face. When Scott and Brooks engaged in the same type of violent conduct that was heading

toward a sexual assault of Sylvia E., they had reason to expect resistance from the victims.

### e. Efforts to minimize the possibility of violence during the crime

The Supreme Court in *Emanuel* distinguished a defendant's "[e]fforts at the planning stage to minimize the potential for violence" from his being present at the scene and attempting "to restrain confederates once the felony is underway." (*Emanuel*, *supra*, 17 Cal.5th at pp. 887–888.) The record does not reveal any discussion or effort by Scott to minimize the risk of violence when planning the take-over robbery. (*Clark*, *supra*, 63 Cal.4th at p. 622.)

*Emanuel* cautioned that the absence of effort to minimize violence does not necessarily evince a subjective disregard for risk when the objective circumstances of the planned crime suggest the risk posed no more than that inherent in any violent felony. (*Emanuel*, *supra*, 17 Cal.5th at p. 888.) In *Emanuel*, the defendant arranged to meet the victim during the day at a public park with no plan that the robbery would involve weapons and no knowledge that the coparticipant had a propensity for violence. (*Id.* at p. 887.)

By contrast, here, Scott and Brooks planned to secrete their actions from public view which elevated the risk to human life. They arranged to invade the Licea home at night, as they did in the four prior incidents. They targeted victims who were outside their homes, as they did in the four prior incidents. This facilitated their entry. As in the prior incidents, Brooks approached the victims first with Scott to follow. Brooks brandished his gun, threatened to kill the victims, and forced

29

them inside the home.  Scott and Brooks made no effort to minimize the risk of violence.

Based on the totality of the circumstances, we conclude substantial evidence supports the superior court's finding that Scott acted with reckless indifference to human life.

### f.     *Scott's age*

Scott points out that he was 18 years old when Sylvia E. and her unborn child were killed.  Youth is relevant to assess whether a defendant acted with reckless indifference to life. (*People v. Ramirez* (2021) 71 Cal.App.5th 970, 987 (*Ramirez*); *In re Moore* (2021) 68 Cal.App.5th 434, 454 (*Moore*).)[14]  Youthful offenders differ from adult offenders in their " 'lack of maturity,' " " 'underdeveloped sense of responsibility,' " which leads to "recklessness, impulsivity, and heedless risk-taking," vulnerability to peer pressure, and underdeveloped character. (*Miller v. Alabama* (2012) 567 U.S. 460, 470–473; *Moore*, at pp. 453–454.)  Of these differences, courts focus on the youth offender's impulsiveness and vulnerability to peer pressure. (*People v. Oliver* (2023) 90 Cal.App.5th 466, 489.)

---

[14]     Both *Moore* and *Ramirez* presented facts insufficient to support reckless indifference, unlike the facts in this case.  In *Moore*, the 16-year-old defendant did not go with the shooter to commit the robbery, nor did he provide the gun to him.  The defendant had no opportunity to prevent the sudden shooting. (*Moore, supra*, 68 Cal.App.5th at pp. 452–453.)  The 15-year-old defendant in *Ramirez* did not plan the carjacking nor provide the gun used in the killing.  He also had no opportunity to prevent the rapidly developing events that turned into the shooting. (*Ramirez, supra*, 71 Cal.App.5th at p. 993.)

30

The superior court determined that nothing showed Scott's youth influenced the commission of the crimes. The record does not support anything about Scott's age or level of maturity that would prevent him from acting with reckless indifference to life or otherwise comprehending the consequences of his actions. "The fact of youth cannot overwhelm all other factors." (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 595.) Our role as a reviewing court is not to reweigh evidence. (*People v. Thomas* (2023) 14 Cal.5th 327, 379.) We see no reason to question the trial court's evaluation of the evidence in this case.

The invasion of the Licea home and the killing of Sylvia E. punctuated the month-long spree of brutality and violence perpetrated by Scott and Brooks. None of the incidents, including the Licea home invasion and killing of Sylvia E., can be described as impulsive acts. Based on their joint participation in these five incidents, Scott knew Brooks was violent. In the Licea invasion, Scott knew Brooks was armed with a loaded gun which had been used in multiple prior incidents. The violence within the Licea home lasted over an hour, culminating in killing Sylvia E. Scott declared that they would kill the victims after they took everything. Not surprisingly, Scott ordered Brooks to shoot Sylvia E. We conclude that youth does not negate the substantial evidence that Scott acted with reckless indifference to human life.

## DISPOSITION

We affirm the superior court's order denying Scott's petition for resentencing under section 1172.6.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


HANASONO, J.


We concur:


EDMON, P. J.


ADAMS, J.